**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON**

**CIVIL ACTION NO. 21-cv-198**

**UNITED STATES OF AMERICA**                                          **PLAINTIFF**

**v.**

**VEARL PENNINGTON and,**                                          **DEFENDANTS**
**MICHAEL WILLIAMSON**

<u>**UNITED STATES OF AMERICA'S MEMORANDUM OF LAW IN
SUPPORT OF SUMMARY JUDGMENT**</u>

On behalf of the Federal Communications Commission ("FCC" or "Commission"), the United States filed this civil action against Defendants Vearl Pennington and Michael Williamson, the former licensee and studio manager, respectively, of low-power television station W10BM ("Station"). This action is brought to enforce an FCC monetary Forfeiture Order dated January 29, 2019, for unlicensed operation of the Station.

It is undisputed that the Station required a license to broadcast. It is also undisputed that Defendants had previously applied for and received an FCC license to operate the Station, but they failed to timely renew the license or otherwise request authority from the FCC to continue operating. As a result, the FCC cancelled the license. Defendants continued to broadcast without a license, despite receiving an FCC notice to cease operations. Defendants' unlicensed operation of the Station violated the Communications Act of 1934, as amended (the "Act" or "Communications Act"), 47 U.S.C. § 301, and they are jointly and severally liable for a forfeiture penalty. As there is no dispute as to any material fact, summary judgment in favor of the Government is appropriate.

## APPLICABLE LAW

If the moving party demonstrates that there is no genuine dispute as to any material fact and that they are entitled to judgment as a matter of law, that party is entitled to summary judgment. F. R. Civ. P. 56; *Kand Medical, Inc. v. Freund Medical Products, Inc.*, 963 F.2d 125, 127 (6th Cir. 1992). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) (emphasis in original). The substantive law applicable to the claimed causes of action will identify which facts are material. *Id.* The moving party need not present its own evidence to support this assertion; rather, it may point only to the *absence* of evidence to support the claim. *Turner v. City of Taylor*, 412 F.3d 629, 638 (6th Cir. 2005). Only if the responding party's allegations are so clearly contradicted by the record that no reasonable jury could adopt them, the court need not accept them when determining whether summary judgment is warranted. *Scott v. Harris*, 550 U.S. 372, 380 (2007). Similarly, the Court must grant summary judgment if the evidence would not support a jury verdict for the responding party with respect to at least one essential element of his claim. *Ford v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

The Communications Act provides the FCC exclusive licensing authority regarding the use of broadcasting frequencies for radio and television stations. With limited exceptions, not applicable here, "[n]o person shall use or operate any apparatus for the transmission of energy or communications or signals by radio" from one place in any state to another place in the same state without a license from the FCC. 47 U.S.C. § 301.

The FCC may issue monetary forfeiture penalties against any person who "willfully or repeatedly" violates the Act. 47 U.S.C. § 503(b). For purposes of the Act, a willful violation requires only "the conscious and deliberate commission or omission of" an act "irrespective of any intent to

violate" the statute. 47 U.S.C § 312(f)(1). A "repeated" violation is one that occurs "more than once" or is "continuous, for more than one day." 47 U.S.C. § 312(f)(2).

## STATEMENT OF UNDISPUTED FACTS

THE STATION'S LICENSE

On December 4, 1987, the FCC granted Pennington's application for a construction permit to build a low-power television[1] station in Morehead, Kentucky. USA-PenningtonWilliamson-59-60. The Station was identified as W10BM, with FCC facility ID No. 69839. *Id.* The construction permit had an expiration date of June 4, 1989. *Id.* The FCC mailed the permit to Pennington at the address he provided on the application: P.O. Box 968 in Mt. Sterling, KY, 40353. *Id.* at 59-60. Pennington later filed an application to modify the Station's construction permit, which was granted and set to expire on August 1, 1998. *Id.* at 209-221. The FCC mailed the modified permit to the same P.O. Box in Mt. Sterling, Kentucky. *Id.* Pennington then applied for a license to operate the Station, which the FCC granted on March 29, 1990, for a license term expiring on August 1, 1993. *Id.* at 63-64. The FCC mailed the broadcast license to the address Pennington provided on the application, P.O. Box 968 in Mt. Sterling, KY, 40353. *Id.* On April 9, 1993, Pennington filed an application to renew the Station's license, which the FCC granted on July 27, 1993, for a license term expiring on August 1, 1998. *Id.* at 65, 195 – 208; 278. Pennington's 1993 renewal application listed his address as P.O. Box 968, Mt. Sterling, KY, 40353. *Id.* at 195-196. Pursuant to Section 73.3539 of the Commission's rules, Pennington was required to file a license renewal application by April 1, 1998—four months prior to the expiration of the August 1, 1998 expiration date of his license issued in 1993. 47 C.F.R. § 73.3539.

License applications, including renewal applications, must be accompanied by an application filing fee, 47 U.S.C. § 158(a), with limited exceptions for governmental entities and certain nonprofit

---

[1] Low Power Television Service (LPTV) is broadcasting by a station at a lower power to a smaller service area than traditional full-power television stations. The FCC established LPTV Service in 1982 to provide opportunities for locally oriented television service in small communities.

public service providers. *Id.* at 158(d)(1). The Commission may also waive or defer payment of an application fee for good cause shown. *Id.* at 158(d)(2). During the relevant period in the case, the application fee was $50. Hossein Hashemzadeh Dep. 32:4-7 (Feb. 18, 2022); 47 C.F.R. § 1.1104(5)(c) (2003) (using 2003 fee schedule because the 2004 fee schedule was not effective until July 2004). The FCC is also required to assess and collect annual regulatory fees from its licensees to recover the costs of its regulatory activities. 47 U.S.C. § 159(a). These regulatory fees are set by the Commission each fiscal year and set forth in a schedule of regulatory fees. *Id.* at § 159(c)(1); s*ee e.g.* USA-PenningtonWilliamson-437-49 (2004 Schedule of Regulatory Fees setting LPTV fee at $385). Licensees who fail to pay applicable regulatory fees are subject to significant monetary penalties and risk rescission of their licenses. *See* 47 C.F.R. § 1.1164.

In March 1997, Williamson began working at the Station. Williamson Dep. 12:15-16 (Feb. 9, 2022). Williamson performed various roles at the Station, including manager of studio operations. *Id.* at 19:22-24:1 ("I just kind of was the guy that stayed I guess and kept it going.") As of approximately 2010, Williamson was the only individual working at the Station. *Id.* at 33:7-8.

THE STATION'S LICENSE CANCELLATION

Defendants failed to file a renewal application for the Station's license on April 1, 1998 or any time before August 1, 1998—the 1993 license expiration date. Pennington Dep. 58:19-61:9 (Feb. 11, 2022). In 2004, the FCC's Media Bureau staff examined FCC records and did not find any record that the Station's license had been renewed prior to its expiration. R. 1-1, ¶ 2. Nor did they find any record that there had been any request for special temporary authority[2] to continue to operate the Station. R. 1-4, ¶ 4. On April 27, 2004, the FCC's Media Bureau sent Pennington a renewal inquiry letter to confirm whether he had filed a renewal application, as required. USA-PenningtonWilliamson-181-182.

---

[2] Pursuant to 47 C.F.R. § 1.931, licensees may apply for special temporary authority to continue operation of a station without a license under special limited circumstances.

The letter "directed [him] to respond within 30 days… demonstrating if [he] and when [he] filed the requisite renewal application." *Id.* Defendants never informed the FCC of an address change, Pennington Dep. 28:12-28:19; 41:8-41:11; therefore, the FCC sent the April 27, 2004 letter to the same P.O. Box as it had mailed the prior licenses. R. 1-4, fn 9.

In 2004, the FCC utilized the Consolidated Database System ("CDBS"), an electronic filing system, for license renewal applications. Hashemzadeh Dep. 9:16-23, 31:19-32:7. When a licensee submits a license renewal application in CDBS, the system then places the application in a "READY" status. *Id.* at 10:6-11:6, 31:19-25. The applicant must then select the option to "pay fee." *Id.* 31:25-32:7. When that step is completed, CDBS connects the applicant to another database managed by the FCC's financial office to pay the filing fee. *Id.* After the filing fee is paid, the status in CDBS changes from "READY" to "FILED" and the application is ready for FCC review. Hashemzadeh Dep. 11:7-19, 13:3-9, 34:92-35:23. The applicant has ten business days to pay the application filing fee so that an application may be filed. *Id.* at 11:7-19.

On May 21 and 22, 2004, Defendants prepared applications for renewal of the Station license at issue and two other licenses Pennington held for two other LPTV stations.[3] USA-PenningtonWilliamson-386-387. The applications remained in a "READY" status in CDBS because the $50 renewal application filing fee was not paid for the stations. *Id.* at 387; Hashemzadeh Dep. 9:24-11:11. Accordingly, the applications were not accepted for filing and the FCC's Media Bureau could not review the applications. *Id.*

Defendants' credit card records reflect a payment of $1,155 to the FCC on August 20, 2004. USA-PenningtonWilliamson-295.

---

[3] In addition, the Station, Pennington held licenses to operate two additional LPTV station —WO5BC in Burlington, Ohio and WO6BD in Mt. Sterling, Kentucky. Williamson Dep. 51: 5-14.

Defendants failed to respond to the FCC's April 27, 2004 inquiry renewal letter. R. 1-4, ¶4. On October 18, 2004, the FCC, having received no response and no filed application or payment of fees, cancelled the licenses and deleted the call sign for the Station, as well as the other two stations operated by Pennington. *Id.* at 183; *see* 47 C.F.R. § 159(c). The FCC sent the cancellation letter to Defendants' address of record, P.O. Box 968, Mt. Sterling, KY, 40353. *Id.*

In 2008, an intern working for Williamson at the Station discovered, in the course of updating the Station's Wikipedia page, that the Station's license had been cancelled. Williamson Dep. 15:5-22. The intern alerted Williamson that the Station's license was cancelled. *Id.* Williamson notified Pennington of the cancellation. *Id.*

THE FCC'S NOTICE OF APPARENT LIABILITY AND FORFEITURE ORDER

In 2016, the FCC learned, in connection with an unrelated license application,[4] that the Station was broadcasting without a license. *Id.* at 104, ¶ 4. On August 16, 2016 ("First Inspection") agents with the FCC's Enforcement Bureau inspected the Station and confirmed that it was broadcasting at a signal strength requiring a license. *Id.* at 1-75; 104, ¶ 5. The Station was operating on frequency 193.25 MHz and had a field strength of 3,090,946 microvolts per meter ($\mu$V/m) at three meters. *Id.* at 45-51. Operation at these frequencies requires a license from the FCC. *See* 47 U.S.C. § 301; 47 C.F.R. § 15.209 (non-licensed broadcasting in the 88-216 MHz band is permitted only if the field strength of the transmission does not exceed 150 microvolts per meter ($\mu$V/m) at three meters.) Both Williamson and Pennington admitted to the Enforcement Bureau agents that the Station was broadcasting. *See Id.* at 39-40; 58; 121; R. 1-2 Page ID #30. During the First Inspection, Williamson provided a business card to the agents listing his Station responsibilities as: "studio manager, production, technician, and sales," along with the address for the station, email address, website, and Facebook page. *Id.* at 53. The agents asked Williamson to produce the Station's license, but he was unable to do so. *Id.* at 3, 39.

---

[4] USA-PenningtonWilliamson-8-17.

The Agents issued Williamson a Notice of Unlicensed Radio Operation (NOUO), which he signed acknowledging receipt. *Id.* at 52. The NOUO stated "UNLICENSED OPERATION OF THIS RADIO STATION MUST BE DISCONTINUED IMMEDIATELY." *Id.* Another NOUO was mailed to the Station on August 22, 2016. *Id.* at 55-56. On August 24, 2016, Williamson, listing his title as "Operations Manager W10BM," sent a letter to the FCC in response to the hand delivered NOUO. *Id.* at 57-58.

On September 7, 2016 ("Second Inspection"), 22 days after the FCC issued Williamson the NOUO and directed the Station to cease broadcasting, an FCC Enforcement Bureau agent returned to the Station. *Id.* at 66. The agent found the Station operating and broadcasting at a field strength of 4,129,453 microvolts per meter ($\mu$V/m) at three meters, higher than the first inspection. *Id.*

On or about May 12, 2017, the FCC issued a Notice of Apparent Liability for Forfeiture (NAL) to Defendants, jointly and severally, for a monetary forfeiture of $144,344 for willfully and repeatedly violating Section 301 of the Act by operating an unlicensed low-power television station on channel 10 in Morehead, Kentucky, after failing to renew the Station's license on August 1, 1998, or thereafter. R. 1-1. The $144,344 penalty comprised a base forfeiture amount of $10,000 per day penalty for the 22-day period between the First Inspection and the Second Inspection when the Station was operating without an instrument of authorization, reduced to the maximum penalty permitted by Section 503(b)(2)(D) of the Act for continuing violations arising from a single act or failure to act. *Id.* The NAL ordered Defendants to pay the full amount of the proposed forfeiture or file a written statement seeking reduction or cancellation of the proposed forfeiture, within 30 days of the date of the NAL. *Id.* The NAL was mailed to both the Station address – 135A Lee Cemetery Road in Morehead, KY and the last address for the licensee on file with the FCC – P.O. Box 968 in Mt. Sterling, KY, 40353. *Id.*

On June 6, 2017, Pennington submitted a written response to the NAL arguing that the NAL should be cancelled. R. 1-2. On June 12, 2017, Williamson submitted a separate written response to the NAL arguing that the NAL should be cancelled. R. 1-3. On February 11, 2018, Williamson filed a supplemental declaration stating that he was unable to pay the $144,433 fine. *Id.*

On or about January 29, 2019, the FCC issued a Forfeiture Order in the amount of $144,344, joint and severally, against Defendants for their willful and repeated violation of Section 301 of the Act by operating an unlicensed low-power television station on channel 10 in Morehead, Kentucky. R. 1-4. The FCC found that a reduction of the forfeiture was not warranted because the violations in this case were egregious, intentional, and repeated, given Defendants' operation of the unlicensed Station for 18 years, their failure to comply with the FCC's verbal and written directives to cease immediately the Station's unlicensed operation, and the potential for such unlicensed operations to interfere with communications by authorized broadcasters and public safety entities. *Id.* ¶¶ 18-21. The Forfeiture Order directed Defendants to pay the forfeiture penalty in thirty days. *Id.*

On June 16, 2021, the FCC issued a Certificate of Forfeiture to the U.S. Department of Justice indicating that the forfeiture remained unpaid. R 1.5. Despite the FCC's demand, Defendants have not paid the Forfeiture.

PENNINGTON'S PETITION FOR RECONSIDERATION AND APPLICATION FOR REVIEW

On July 2, 2017, almost 13 years after the FCC cancelled the Station's license and almost 19 years after the license expired, Pennington filed a Petition for Reconsideration with the FCC's Media Bureau, challenging the cancellation of his license and seeking its reinstatement. USA-WilliamsonPennington-284-92. On June 21, 2018, the Media Bureau dismissed the Petition on procedural grounds, finding that it was untimely. *Id.* at 292. The Media Bureau concluded that Pennington should have sought reconsideration no later than November 17, 2004—30 days after the FCC cancelled the Station's license. *Id.* at 289-90. The Media Bureau also denied Pennington's

substantive arguments. *Id.* at 290-91. The Media Bureau found that Pennington never filed renewal applications for the 1998 renewal cycle and that he failed to demonstrate that he properly filed the 2004 renewal application within the 30-day period specified in the April 2004 renewal inquiry letter. *Id.* The Media Bureau determined that the May 2004 renewal application was not accepted for filing because Pennington failed to pay the application filing fees, which is a condition precedent for filing renewal applications; consequently, the FCC could not review the application. *Id.* Moreover, the Media Bureau found that the $1,155 that was paid in 2004 was for the Pennington's three stations' annual regulatory fees, not payment of the application filing fees for the 2004 renewal application as asserted by Pennington. *Id.*

On July 20, 2018, Pennington filed an Application for Review with the FCC seeking review of the Media Bureau's 2018 decision. *Id.* at 280-87. Pennington argued that the Media Bureau's finding was not supported by "substantial evidence in the record;" that the Media Bureau violated his right to equal protection under the Fifth Amendment by treating him differently from other licensees; and the Media Bureau's failure to reinstate and renew the Station's license was inconsistent with the FCC's public interest mandate under section 307(a) of the Act. *Id.* On September 18, 2019, the FCC issued a Memorandum Opinion and Order denying Pennington's Application for Review *Id.* 246-51. The FCC upheld the Media Bureau's finding that the underlying Petition was procedurally deficient under section 405(a) of the Act. *Id.* The FCC declined to address the new arguments Pennington raised in the Application for Review because they were procedurally defective. *Id.* Pennington did not appeal the FCC's July 20, 2018 Memorandum Opinion and Order.

## QUESTIONS PRESENTED

1) Whether Defendants violated Section 301 of the Communications Act by broadcasting without a license.
2) Whether Defendants are jointly and severally liable for the monetary forfeiture amount issued by the FCC.
3) Whether the forfeiture penalty assessed by the FCC is reasonable and appropriate.

## ARGUMENT

A fundamental obligation of the Communications Act is that broadcasters must obtain a license from the FCC in order to operate radio and television facilities. 47 U.S.C. § 301. Unlicensed operations can interfere with licensed communications by authorized broadcasters and with important public safety messages. There is no dispute that Defendants violated Section 301 of the Act by broadcasting without a license in 2016 and for the prior 18 years. Accordingly, Defendants are jointly and severally liable for the monetary forfeiture penalty for their willful and repeated violation of Section 301. The forfeiture penalty of $144,344 assessed against Defendants by the FCC is reasonable and appropriate because the violations in this case are egregious, intentional, and repeated.

I.   DEFENDANTS VIOLATED SECTION 301 OF THE COMMUNICATIONS ACT BY OPERATING WITHOUT A LICENSE.

There is no dispute that Defendants were required to have a license to operate the Station. But Defendants failed to renew their license before it expired on August 1, 1998. Defendants first initiated the license renewal process in May 2004, six years after their license expired, but they were unable to complete the renewal application process because they failed to pay the application filing fee within the ten-day period prescribed for payment after submission of the application. Nor did Defendants seek special temporary authority to broadcast after the license expired in 1998 and before the FCC cancelled the license in October 2004. Additionally, Defendants' attempt to renew their license in 2004, even if successful, would have authorized broadcasting only for the 1998-2005 license term. Further, Defendants admit to operating the station in 2016, despite the FCC's directive to cease

the unlicensed broadcasting. In doing so, Defendants violated Section 301 of the Act and summary judgment should be granted in favor of the Government.

### a. The Station Required A License To Broadcast.

LPTV stations, like other radio and television broadcast stations, must be licensed by the FCC. 47 U.S.C. § 301. Transmission without a specific license is only permitted for transmitters that emit signals at the very low levels set forth in a blanket exemption in Part 15 of the Commission's rules. 47 C.F.R. §§ 15.1 *et seq.* (Examples of such "Part 15" devices include garage door openers and baby monitors). Section 15.209 of the Commission's rules provides that non-licensed transmission in the 88-216 MHz band is permitted only if the field strength of the transmission does not exceed 150 microvolts per meter (µV/m) at three meters. 47 C.F.R. § 15.209. Measurements taken by FCC Enforcement Bureau agents on August 16, 2016, showed that W10BM was broadcasting at a field strength of 3,090,946 µV/m (extrapolated to three meters), a value that exceeded the permissible level for a non-licensed Part 15 transmitter by a factor of 20,606. USA-PenningtonWilliamson-45-51. Further, measurements taken by an FCC Enforcement Bureau agent on September 7, 2016, showed a field strength of 4,129,453 µV/m (extrapolated to three meters), a value that exceeded the permissible level for a non-licensed Part 15 transmitter by 27,530 times. *Id.* at 66-75. Defendants have not contested these measurements and that the field strength of the transmissions far exceeded the limits for unlicensed transmissions permitted under Part 15 of the Commission's rules, 47 C.F.R. § 15.209; therefore, there is no dispute that the Station required a license under Section 301 of the Act, 47 U.S.C. § 301.

Moreover, Pennington filed for a license to broadcast in 1990 and renewal in 1993 and attempted to renew the license in 2004. USA-PenningtonWilliamson-63-64, -65; Pennington Dep. 50:10-20. Pennington was thus well aware that the Station required a license to broadcast.

###### b.  Defendants Failed To Renew The Station's License Before It Expired In 1998.

A licensee is "charged with knowledge of the full range of its obligations, including its duty to timely seek renewal of its license to maintain operating authority." *Discussions Radio, Inc.,* Memorandum Opinion and Order and Notice of Apparent Liability, 19 FCC Rcd 7433, 7437, ¶ 12, 2004 WL 816363 (Apr. 13, 2004); *see also Morris Communications, Inc. v. F.C.C.*, 566 F.3d 184, 190 (D.C. Cir. 2009). The Communications Act of 1934 initially granted station licenses for a five-year term. 47 U.S.C. § 307(b), June 19, 1934. In 1996, Section 307 was amended to grant station licenses for an eight-year term. 47 U.S.C.§ 307(c). Accordingly, Defendants were required to ensure their license to broadcast was renewed every five years until 1996 and every eight years thereafter. A license renewal application "shall be filed not later than the first day of the fourth full calendar month prior to the expiration date of the license sought to be renewed[.]" 47 C.F.R. § 73.3539(a).

There is no dispute that Defendants were required to renew the Station's 1993 license by April 1, 1998 and that they failed to do so. Defendants clearly understood the renewal process. The Station's first license was granted on March 29, 1990, for a licensing term expiring on August 1, 1993. USA-PenningtonWilliamson-63-64. Pennington timely renewed this license before its expiration date and paid the associated regulatory and renewal filing fees. That license renewal application was granted on July 27, 1993 for the license term expiring on August 1, 1998. *Id.* at 239, 278-279. The Station was thus required to submit a license renewal application along with application filing fees no later than April 1, 1998. 47 C.F.R. § 73.3539(a). The FCC has no record of a license renewal application by that date. *See* R. 1-1; R. 1-4; *see also* Declaration of Cheryl Collins, Chief of the Revenue and Receivables Operations Group, FCC, April 6, 2022 (Exhibit A).

Pennington admits that he does not remember filing a renewal of his license in 1998. Pennington Dep. 50:7-50:9. He further admits that he has no documentation confirming he paid any fees in 1998. Pennington Dep. 58:19-58:22.

Defendants contend that the FCC failed to notify them of the need to renew their license. Williamson Deposition 55:7-55:12 ("we got renewal notices by those green cards. And I guess you become to rely on them."); 56:2-56:12 ("You come to rely on the reminders;" "you depend on that reminder to tell you to go do it."). However, an FCC license renewal notice is merely a courtesy. *Life on the Way Communications, Inc.,* Forfeiture Order, 30 FCC Rcd 2603, 2608, n. 34, 2015 WL 1307906 (March 23, 2015). A licensee is obligated to timely file a license renewal application which "attaches irrespective of its failure to receive Commission notification" of an upcoming renewal deadline. *Discussion Radio.* 19 FCC Rcd at 7437, n. 20 (*citing ACC Network Corp.,* Order, 16 FCC Rcd 22446, 22447, 2001 WL 1631199 (Dec. 18, 2001)). There is no dispute of fact that the Station's license expired on August 1, 1998; any broadcasting after that expiration was unlicensed in violation of Section 301 of the Act.

### c. **Defendants Failed To File A Renewal Application In 2004**.

In granting licenses and renewal applications, the FCC must assess and collect application filing fees. 47 U.S.C. § 158(a). "The Commission may dismiss any application or other filing for failure to pay in a timely manner any application fee or penalty[.]" 47 U.S.C. § 158(c)(2). Only if good cause is shown may the FCC waive or defer payment of an application filing fee. 47 U.S.C. § 158(d)(2). In 2004, the FCC required licensees to apply for license renewals via the CDBS Electronic Filing System. Hashemzadeh Dep. 9:16-23, 31:19-32:7. The application process is a two-step process that first requires preparation of an application via CDBS and then payment of the renewal application filing fee. *Id.* at 10:6-11:6, 31:19-32:7. When the first step is completed the CDBS indicates the application is "READY." *Id.* at 10:6-11:6, 31:19-25; *see e.g.* USA-PenningtonWilliamson-386-387. Only after the applicant pays the renewal application filing fee is the application filed and the FCC able to process the application. Hashemzadeh Dep. 11:7-19, 13:3-9, 34:92-35:23. The status in CDBS then changes from "READY" to "FILED." *Id.* In 2004, the filing fee was $50. *Id.* 32:4-7; 47 C.F.R. § 1.1104(5)(c)

(2003). CDBS allowed applicants a 10-business day grace period to pay the application filing fee after the preparation of the application. Hashemzadeh Dep. 11:7-19.

Defendants contend that they were authorized to broadcast in 2016 because they filed a license renewal in May 2004. But the record evidence is clear—Defendants failed to properly file the renewal application in May 2004. *See e.g.* USA-PenningtonWilliamson-386-387. On May 21 and 22, 2004, Defendants prepared renewal applications in CDBS for Pennington's three LPTV stations—the Station, WO5BC, and WO6BD—but, as the CDBS report shows, the applications remained in "READY" status. *Id.* This is because they failed to pay the $50 per station renewal application filing fee at the time the applications were submitted or within the 10-business day grace period. Hashemzadeh Dep. 9:24-11:17. Defendants do not contend that they paid the $50 per station renewal application filing fee by June 4, 2004. Accordingly, in compliance with 47 U.S.C. § 158, CDBS did not accept the license renewal applications and the FCC staff did not process the renewal applications. Therefore, there is no genuine dispute of fact that Defendants did not file a renewal application along with the filing fee in in May 2004.

Prior to Defendant's May 21-22, 2004 attempt to submit renewal applications in CDBS, the FCC sent Defendants a renewal inquiry letter on April 27, 2004, confirming the status of the renewal application and providing them 30 days to demonstrate that they filed a renewal application for the Station. USA-PenningtonWilliamson-181-182. On October 18, 2004, the FCC, having received no response to its April renewal inquiry letter and no filed application, cancelled the Station's license and deleted the Station's call sign. *Id.* at 183. Defendants did not timely seek reconsideration of the cancellation, so the cancellation became final.[5] 47 U.S.C. § 405(a); 47 C.F.R. § 1.106(a)(1).

---

[5] *See infra* at 8-9. Pennington filed a Petition for Reconsideration of the license cancellation in 2017, after receiving the Notice of Apparent Liability. USA-PenningtonWilliamson-288-92. On June 21, 2018, the FCC dismissed that Petition on procedural grounds, finding that it was nearly 13 years late. *Id.* On July 20, 2018, Pennington filed an Application for Review seeking review of the dismissal of his Petition, which the FCC denied on September 18, 2019. *Id.* at 246-51. Pennington did not appeal the FCC's September 18, 2019 denial. To the extent Defendants seek to challenge the validity of the FCC's order this Court does not have jurisdiction to hear those arguments. The Hobbs Act grants circuit courts of

Defendants contend that they made a payment to the FCC of $1,155 on August 20, 2004. USA-PenningtonWilliamson-295. Pennington asserts that "[a]t the rate of $50 each for the three stations, I understood that this [$1155 payment] would pay the renewal fees for the 3 stations through the year 2022." *Id.* at 293-294. This payment does not render the May application submissions effective. The renewal application filing fee of $50 was due at the time the application was submitted, or up to ten business days later. 47 U.S.C. § 158; Hashemzadeh Dep. 11:7-19. The undisputed facts show that the payment was not made within the requisite time period, so the May 2004 application was never filed. The payment of $1,155, after the filing deadline for the license renewal application, does not cure Defendants' failure to renew the license application. *Morris Communications, Inc.*, 566 F.3d at 191-92.

Further, Pennington's prepayment argument is not reasonable. It strains credulity to think that a licensee would pre-pay license renewals for 18 years, when the Station may not exist in the future. Additionally, application fees change periodically, and license terms are also subject to modification. The only reasonable explanation is that Pennington paid the Commission $1,155 in 2004 to satisfy the 2004 regulatory fee obligations for each of his three stations, the Station, WO6BC and WO5BC, (*i.e.* $385 x 3 = $1155); it was plainly not a prepayment of the application filing fees.

Even if Defendants had properly filed a license renewal application in 2004, Defendants admit that they did not pay the required regulatory fees each year. To maintain a license between 1998 and 2022[6], Defendants were required to have made 24 years of regulatory fee payments. *See* 47 C.F.R § 1.1104(5)(c); USA-PenningtonWilliamson-438. Pennington admits that he either never made, or does

---

appeals exclusive jurisdiction to determine the validity of certain agency orders and requires an aggrieved party to seek judicial review within 60 days of such a final order's entry. *See Self v. Bellsouth Mobility, Inc.*, 700 F.3d 453, 461 (11th Cir. 2012) ("[T]he courts of appeals have exclusive jurisdiction over claims to enjoin, suspend, or invalidate a final order of the FCC."); *see United States. v. Any & All Radio Station Transmission Equip.*, 207 F.3d 458, 463 (8th Cir. 2000) (in a forfeiture action against a broadcaster without a license, the district court had no jurisdiction to determine validity of FCC rule because Courts of Appeals have exclusive jurisdiction over rulemaking by the FCC).

[6] While not material, there is some indication the Station, was still operating as late as March 2022. *See* Exhibit B: Notices from Spectrum.

not remember making, any payments to the FCC from 1998 until any time thereafter, except for the

single payment of $1,155 in 2004. USA-PenningtonWilliamson-293-95. Pennington testified as follows

at his deposition:

| | | |
|---|---|---|
| Q: | Do you have any records indicating any fees that you paid over the past ten years? |
| A: | No. |
| Q: | Any annual fees? |
| A: | No. |
| | [clarification discussion] |
| Q: | So do you have any confirmation, any documentation confirming that you paid any fees in 1998? |
| A: | No, I don't have any |
| Q: | What about 1999? |
| A: | I don't have. |
| Q: | 2000? |
| A: | No. |
| Q: | 2001? |
| A: | No. |
| Q: | 2002? |
| A: | No. |
| Q: | 2003? |
| A: | We're getting into that period of time – |
| Q: | Sure. Anything in 2003 through the date? |
| A: | No. |
| | [discussion of 2004 payment] |
| Q: | … Anything in 2005? Any payments made in 2005 that you're aware of? |
| A: | No |
| Q: | 2006? |
| A: | No, there was a billing from FCC in 2006 or 2007. |
| | [brief discussion of billing] |
| Q: | So just to reiterate, no record of any payment you made – |
| A: | No. |
| Q: | -- in 2006? |
| A: | No, sir. |
| Q: | Nothing in 2007? |
| A: | No |
| Q: | Acknowledging there's a bill there was a bill that you received in 2007, I believe 2007? Any payments in 2008? |
| A: | No. |
| Q: | 2009? |
| A: | No. |
| Q: | 2010? |
| A: | No. |
| Q: | 2011? |
| A: | No. |
| Q: | 2012? |

A:      No.
Q:      2013?
A:      No.
Q:      In any of the years –
A:      Subsequent, no.

Pennington Dep. 58:4 – 61:1. Therefore, Defendant's failure to pay the applicable regulatory fees was also grounds for cancellation of their license. *See* 47 U.S.C. § 159(c)(3); 47 C.F.R. § 1.1164.

Defendants further argue they were authorized to continue broadcasting because their May 2004 renewal application was pending. Pennington Dep. 50:22 - 51:3; USA-PenningtonWilliamson-293. A broadcast license continues in effect beyond its expiration date when a renewal application is pending: "[w]here there is *pending* before the Commission *at the time of expiration of license* any proper and timely application for renewal of license … such license shall continue in effect[.]" 47 C.F.R. § 1.62(a)(1) (emphasis added). But because Defendants' renewal application was due no later than April 1, 1998, any renewal application filed thereafter was not "proper and timely." *See* 47 C.F.R. § 73.3539(a). It is undisputed that Defendants did not file a renewal application prior to April 1, 1998 or even prior to the Station's license expiring on August 1, 1998. *See* Exh. A; Pennington Dep. 63:7-19. Even assuming the May 2004 applications were properly filed, they were not "pending before the Commission at the time of [the] expiration of [the] license." In any event, Defendants did not have a pending application in 2004 that was "before the Commission" because they failed to pay the required application filing fees and so the applications remained in a "READY" status, not "FILED" status. USA-PenningtonWilliamson-386-387; *see also* Hashemzadeh Dep. 10:19-22, 31:22-33:3, 34:9-20. In sum, the undisputed facts show Defendants did not have an application pending before the Commission at the time of their license expiration that would have allowed them to continue to operate, as provided for in 47 C.F.R. § 1.62.

### d.  The FCC Sent All Notices To Defendants' Address Of Record.

Defendants contend that the Station never used P.O. Box 968 Mt. Sterling, KY 40353, (hereinafter "P.O. Box 968"), the address they provided to the FCC and, therefore, they did not receive notice of the 2004 license cancellation. Pennington Dep. 20:3-5. Defendant's lack of notice argument is without merit.

Under FCC regulations each licensee must provide an address to the Commission for service of documents and correspondence. 47 C.F.R. § 1.5(a). "Unless any licensee advises the Commission to the contrary, the address contained in the licensee's most recent application will be used by the Commission[.]" *Id.* The regulations make clear the licensee is responsible for ensuring the documents sent to the address reach the licensee. *See* 47 C.F.R § 1.5(b). Further, "[e]ach applicant is responsible for the continuing accuracy and completeness of information furnished in a pending application" and when that information changes during the pending application the applicant must, within 30 days amend the application to correct the application." 47 C.F.R. § 1.65(a).

In 1987, Pennington's construction permit application had the P.O. Box 968 address. USA-PenningtonWilliamson-59-60; -209-210. In 1990, the FCC granted Pennington a broadcast license, notice of which was mailed to P.O. Box 968. *Id.* at 63-64; 179-180. The 1993 license, expiring on August 1, 1998, also had P.O. Box 968 as the address of record. *Id.* at 278. In fact, Williamson, in a letter sent to the FCC in response to the hand delivered NOUO, attached exhibits which confirmed the Station used P.O Box 968 as the address on record with the FCC. *Id.* at 57-65. The record is clear that Defendants provided P.O. Box 968 as the address of record and the FCC was correct to send correspondence to that address. *See* 47 C.F.R. § 1.5.

Furthermore, the FCC sent the April 27, 2004 renewal inquiry letter to P.O. Box 968. USA-PenningtonWilliamson-181-182. In direct response to that letter, in May 2004, Pennington prepared three license renewal applications for each of his stations. USA-PenningtonWilliamson-318-319.

Additionally, in August 2004, Pennington made a $1,155 payment made to the FCC, reasoning that,

"this would pay the renewal fees for the 3 stations through the year 2022." *Id.* at 293-295. In fact,

Pennington admitted that he received the 2004 notices:

> Q:    And in 2004 how did your license renewal process develop? How did you realize that
>       you needed to do this?
> A:    Correspondence from the FCC
> Q:    Okay. What correspondence was that?
> A:    They indicated that the license was I don't know whether it was expiring or coming
>       up for expiration one or the other.
> Q:    Okay
> A:    And so, I developed the applications for the three stations.

Pennington Dep. 50:10-20. The undisputed facts and admissions also show that P.O. Box 968 was

the official address for the licensee since 1987. Given their own admissions, there is no genuine dispute

of material fact that Defendants received notice of their licensure problems.

### e.  The 2004 Attempted Renewal Is Irrelevant.

The fact that Defendants attempted to submit a renewal application in 2004, six years after

the license expired, is immaterial for several reasons: 1) they failed to seek a special temporary authority

to operate between 1998 and 2004, and 2) the renewed license would have authorized broadcasting

only for the 1998-2005 license term and Defendants have no evidence of filing a renewal application

for the 2005-2013 and 2013-2021 license terms. Even if Defendants had filed a renewal application in

2004, the act of filing a renewal application, alone, would not cure the Station's unauthorized

operation. Although Section 307(c)(3) of the Act permits licensees to continue operation while there

is a pending license renewal application, a licensee that fails to file a license renewal application by its

license expiration date and continues to operate without special temporary authority is engaged in

unauthorized operation and subject to sanction. *See*, *e.g.*, *Atlantic City Board of Education,* Memorandum

Opinion and Order, 31 FCC Rcd 9380, 9385, para. 11 (2016); *Pollack/Belz Communications Company,*

*Inc.*, Notice of Apparent Liability for Forfeiture, 29 FCC Rcd 1063 (MB 2014) (four months late and

with prior license renewal application still pending), *forfeiture ordered*, Forfeiture Order, 29 FCC Rcd

14635 (MB 2014); and *J. Thomas Development of NM, Inc.*, Memorandum Opinion and Order and Notice of Apparent Liability for Forfeiture, 27 FCC Rcd 10859 (MB 2012) (over 5 years). No request for special temporary authority was ever filed. R. 1-4, ¶ 4. In addition, regardless of whether the license renewal application that was submitted in 2004 was still pending or had been granted, this license renewal application would have only covered the station's 1998 to 2005 license term. *Id.* Two additional renewal applications would also have been required to cover subsequent license periods – one by April 1, 2005 (for the 2005-2013 license term) and the next by April 1, 2013 (for the 2013-2021 license term). *Id.* An examination of CDBS finds that these required filings were not made, and Defendants have provided no evidence to the contrary. USA-PenningtonWilliamson-386-387. Thus, even if the 2004 renewal application had been accepted for filing, the Station would still have lacked authority to operate after 2005.

### f. Defendants Operated Without A License From August 16, 2016 To September 7, 2016 In Violation Of Section 301 Of The Act.

FCC Enforcement Bureau agents inspected the Station on August 16, 2016. USA-PenningtonWilliamson-45-51. As discussed in Section I.a. *supra*, the agents determined that the Station was broadcasting at field strength transmission levels that far exceeded the permitted unlicensed transmission limits and the Station required a permit under Section 301 of the Act. During the inspection, Williamson was unable to produce a current license upon request from the Agents but admitted the Station was in operation. *Id.* at 3; 33-34 39; Pennington Dep. 85:20-85:24. During the August 16 inspection, agents hand-delivered, and Williamson acknowledged receipt of, the NOUO, informing the Station to cease operations due to the lack of a license. USA-PenningtonWilliamson-34, -52. Another NOUO was mailed to the studio address. *Id.* at 55-56.

The NOUO specifically stated, "UNLICENSED RADIO OPERATION OF THIS RADIO STATION MUST BE DISCONTINUED IMMEDIATELY." *Id.* at 34, 52, 55. But Defendants did not comply. An FCC Enforcement Bureau agent returned to inspect the Station on September 7, 2016

and observed that it was still broadcasting. *Id.* at 66. The agent determined that 22 days after being hand-delivered the NOUO, Defendants were operating the Station in excess of the unlicensed transmission limits under 47 C.F.R. § 15.209. *Id.*; *see also* Section 1.a *supra*.

Defendants admit they continued broadcasting during the 22 days between the first and second inspection, despite receiving the NOUO. *Id.* at 121-122 (this "station has continued to be operated as a source of local information …"); 118-119; 121; 285 ("Pennington lawfully continued to operate his television stations."); Pennington Dep. 86:14 – 86:22. In fact, in his August 2016 letter in response to the NOUO, Williamson argued that "[f]or us to cease operation immediately, as requested in your written notice dated 8/16/2016, would deprive many citizens of Morehead of their only source of news and other events." USA-PenningtonWilliamson-58.

Upon receipt of the NOUO, Defendants were required to cease broadcasting. Instead, they willfully and repeatedly operated the Station without a license in violation of Section 301 of the Act. *See* 47 U.S.C. § 312(f); *United States v. Dudley*, 2020 WL 4284052, at *3 (N.D. Ala. July 27, 2020) (defendant's admission that he operated an unlicensed radio station "establishes that he willfully violated the Communications Act.").

## II.    DEFENDANTS ARE JOINTLY AND SEVERALLY LIABLE FOR THE FORFEITURE PENALTY.

Pennington was the licensee of the Station and is thus liable for the Station's failure to maintain proper authority to operate. *Discussions Radio, Inc*, 19 FCC Rcd at 7437. In addition to the licensee, other individuals may be held jointly and severally liable when more than one party demonstrates control over a station. *See e.g.*, *Andre Alleyne Jessie White*, Forfeiture Order, 26 FCC Rcd 10372, 2011 WL 3099890 (July 25, 2011); *In the Matter of Fabrice Polynice North Miami, FL*, 37 FCC Rcd 7949 (2017) (demonstrated management and control); *In the Matter of Telseven, LLC, Calling 10, LLC, Patrick Hines a/k/a P. Brian Hines*, 31 FCC Rcd 1639 (2016) (engaging in operation of the station); *In the Matter of Scott Malcome DSM Supply, LLC, Somaticare, LLC*, 31 FCC Rcd 1652 (2016) ("unity of interest and

ownership"). Control is defined as "any means of actual working control over the operation of the [station] in whatever manner exercised" *Id.* (quoting Revision of Rules and Policies for the Direct Broadcast Satellite Service, 11 FCC Rcd 9712,9747 (1995), *recon. denied, DIRECTV, Inc. v. FCC*, 110 F. 3d 816 (D.C. Cir. 1997).

In order to avoid liability, Williamson asserts that he lacked control of the Station. R 25. The record does not support this argument. The facts in this case are similar to those in *Andre Alleyne Jessie White*. Williamson had working control over the operation of the Station. First, Defendants admit that Williamson was the only person running the station since 2010. Williamson Dep. 19:22-24:1 ("I just kind of was the guy that stayed I guess and kept it going."); 33:7 ("Basically since 2010…"); Pennington Dep. 30:19 – 30:25 ("Michael Williamson was a contractor who oversaw everything there, most of the stuff."). Second, Williamson identified himself as the manager of the studio/station. USA-PenningtonWilliamson-53, -58, -321; Williamson Dep. 31:21-31:22. He acknowledged that he had ordered the business cards that identified himself as studio manager. Williamson Dep. 31:21 – 31:22; 65:14 – 65:19. He also signed a letter to the FCC as "Operations Manager W10BM". USA-PenningtonWilliamson-57-58. Third, Williamson admitted he ran the station. Williamson Dep. 24:21 – 24:23 ("I was running it as a cable station[.]"); 23:23-24:1. Fourth, Williamson took affirmative actions that a manager, and not "talent," typically would take such as deciding not to turn off the transmitter, Williamson Dep. 26:20 – 26:21; developing a website for the Station, Pennington Dep. 87:22-88:9; preparing license renewal applications, Williamson Dep. 50:19 – 50:20; and appealing the cancellation of the license, Pennington Dep. 75:19- 76:7. Fifth, Defendants both admit Williamson was "responsible for producing the content for the station to broadcast." Williamson Dep. 11:6-11:25, 19:11-19:15, 35:21-35:25; Pennington Dep. 33:5- 33:12.

Given the undisputed facts and admissions, a reasonable jury would find that Williamson "demonstrated management and control over the station as a whole," along with Pennington. *Andre*

*Alleyne Jessie White*, 26 FCC Rcd at 10374. Therefore, Defendants are jointly and severally liable for operating the Station without a license in violation of Section 301 of the Communications Act and summary judgment against both Pennington and Williamson is appropriate.

III.    DEFENDANTS' FORFEITURE PENALTY IS REASONABLE AND APPROPRIATE.

The Court's review of the appropriateness of a forfeiture order is *de novo*. 47 U.S.C. § 504(a). Thus, "the court should make an independent determination of the issues." *United States v. First City Nat. Bank of Houston*, 386 U.S. 361, 368 (1967); *see also United States v. Daniels*, 418 F. Supp. 1074, 1080–81 (D.S.D. 1976) ("The broad powers of judicial review granted in [§ 504 of the Communications Act] necessarily include the power to review ... the amount of any forfeiture imposed.").

The Government requests the imposition of a judgment in the amount of $144,344. *See* USA-PenningtonWilliamson-304-316; -92-116; -323-330. The FCC is authorized to impose a civil penalty (forfeiture) against any individual or entity for "willfully and repeatedly" failing to comply with the Communications Act or the Commission's rules, regulations, or orders. 47 U.S.C § 503(b). For purposes of the Act, a willful violation requires only "the conscious and deliberate commission or omission of" an act "irrespective of any intent to violate" the statute. 47 U.S.C § 312(f)(1). A "repeated" violation is one that occurs "more than once" or is "continuous, for more than one day." 47 U.S.C. § 312(f)(2).

Section 1.80 of the Commission's rules provides the amount of forfeiture penalties the FCC may impose for violations. 47 C.F.R. § 1.80. Section 1.80(b) of the Commission's rules sets a base forfeiture of $10,000 for the construction or operation of a station without an instrument of authorization for the service for each violation or each day of a continuing violation. *Id.* The FCC assessed the penalty for each of the 22 days between the First Inspection and Second Inspection that the Defendants operated without a license and in violation of the directive to cease operations. R. 1-4. The total penalty would have equaled $220,000 (*i.e.* $10,000 x 22= $220,000), but the FCC reduced

the penalty to the statutory maximum penalty for continuing violations arising from a single act or failure to act of $144,344. 47 C.F.R. § 1.80(b)(7) (2017) (indicating that the maximum penalty for violations of 47 U.S.C. § 503(b)(2)(D) after the 2017 inflation adjustment is $144,344). In assessing the monetary forfeiture amount, the FCC was required to consider "the nature, circumstances, extent, and gravity of the violation and, with respect to the violator, the degree of culpability, any history of prior offenses, ability to pay, and such other matters as justice may require." 47 U.S.C. § 503(b)(2)(E). The FCC complied with this mandate. *See* R. 1-1, ¶¶ 22-26; R. 1-4, ¶¶ 9, 20.

Defendants' actions were clearly willful and repeated. Defendants failed to renew their license in 1998, yet they continued operating for decades. Defendants received notice of their failure to renew the license in 2004, yet they continued their unlicensed operation. USA-PenningtonWilliamson-181- 182. Defendants received notice of the deletion of their call signs, yet they continued to operate. *Id.* at 34, 52, 58, 118-119, 121-22, 183, 285; Pennington Dep. 86:14 – 86:22. Defendants were reminded of the cancellation and deletion of the Station's license in 2008 by an intern, yet they continued to operate. Williamson Dep. 15:5-22. In August 2016, Defendants were hand delivered and mailed a NOUO requiring them to cease broadcasting, yet they continued to operate for at least the next 22 days. USA-PenningtonWilliamson-45-51. Defendants intended to keep the Station operating. That Defendants may not have the intent to violate the Statute is irrelevant as to whether their conduct was willful and repeated. 47 U.S.C § 312(f)(1).

Furthermore, Defendants received direct notice, including verbal and hand-delivered notice, that they were operating without a license. Instead of admitting to the mistake, terminating the broadcasts, and discussing the matter with the Commission, Defendants argued they never received notice in 1998 of the renewal requirements. But the licensee is "charged with knowledge of the full range of its obligations." *Discussion Radio Inc.*, 19 FCC Rcd 7433, 7437. In 2004, when Defendants prepared a 2004 renewal application yet failed to pay the application filing fee, instead of resolving the

matter, they blamed the Commission for allegedly providing conflicting fee information and maintaining an allegedly bad database. At every turn, Defendants have attempted to blame the Commission for their own failure to comply with their obligations as a licensee rather than take responsibility for their own actions.

Under the circumstances, the imposition of a $144,344 fine is appropriate given Defendants willful and repeated unlicensed operation of the Station since 1998. *See United States v. Polynice*, 2022 WL 860381, at * 2 (S.D. Fla. March, 21, 2022) (imposition of a $144,344 fine "warranted and justified" given repeated violations and continued operation of the station despite written and verbal warnings).

## CONCLUSION

For the foregoing reasons, the Government is entitled to summary judgment and respectfully requests that its motion be granted.

Respectfully submitted,

CARLTON S. SHIER, IV
UNITED STATES ATTORNEY

By: *s/ Rajbir Datta*
    Rajbir Datta
    Assistant United States Attorney
    260 West Vine Street, Ste. 300
    Lexington, KY 40507
    Phone: (859) 233-2661
    Email: Rajbir.Datta@usdoj.gov

CERTIFICATE OF SERVICE

On June 3, 2022, I electronically filed this document through the ECF system, which will send a notice of electronic filing to all the parties in this case. I further certify that on June 3, 2022 a copy of this motion, discovery package, three transcripts, and Exhibits A and B were also mailed by FedEx and emailed to the following individuals.

Mr. Michael Williamson
135 Lee Cemetery Road
Morehead Kentucky 40360
TV10Morehead@yahoo.com

Mr. Vearl Pennington
113 Gugdell Avenue
Owingsville Kentucky 40360
VearlSkeets@gmail.com

s/ Rajbir Datta
Rajbir Datta
Assistant United States Attorney
260 West Vine Street
Lexington, KY 40507
(859) 233-2661
Rajbir.Datta@usdoj.gov