UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 5:21-CV-198-REW-MAS |
| v. ) | |
| ) | OPINION AND ORDER |
| VEARL PENNINGTON, & ) | |
| MICHAEL WILLIAMSON, ) | |
| ) | |
| Defendants. | |

\*\*\* \*\*\* \*\*\* \*\*\*

Before the Court are the parties' cross-motions for summary judgment. *See* DE 36, 37, 38. For the following reasons, and upon consideration of the full record, the Court **GRANTS** the United States's motion and **DENIES** Defendants' motions. The forfeiture is enforced as ordered.

I.  **Background**

   a.  **Factual Background**

This matter arises from the unlicensed operation of a television station. In December 1987, Defendant Vearl Pennington constructed a low-power television station ("the Station") in Morehead, Kentucky. *See* DE 1 ¶ 17 (Complaint). He obtained a license to operate the Station, as required by the Federal Communications Commission ("FCC"), which would expire on August 1, 1993. *See id.* ¶¶ 18-19. Prior to its expiration date, Pennington applied to renew the license, which the FCC granted for a term set to expire on August 1, 1998. *See id.* ¶ 19. The license had a 5-year term at that time.

To lawfully operate the Station after August 1, 1998, FCC regulations required Pennington to file a license renewal application by April 1, 1998, four months prior to the license's expiration date. *See* 47 C.F.R. § 73.3539. According to FCC records, Pennington never renewed the license.

1

*See* DE 1 ¶ 20. On April 27, 2004, six years hence, the FCC notified Pennington via mail, at his official address, that it did not receive a renewal application. *See id.* ¶ 21. The notification explained that Pennington had thirty days to establish that he had applied for renewal and, if he failed to do so, that the FCC would update its database to reflect the cancellation of the Station's license. *See id.* Pennington never directly responded.[1] *See id.* ¶ 22.

However, in May 2004, Pennington filed an application in the FCC's Consolidated Database System ("CDBS") to renew the Station's license.[2] *See* DE 36-2 at 386 (FCC Database). Upon filing, as a step in the sequence, the CDBS placed the application in "READY" status. *See id.* Once an application is designated "READY," the CDBS connects the applicant to the FCC's financial office, so that the applicant can pay the required filing fee, which was fifty dollars at the time Pennington filed the 2004 application. *See* 47 C.F.R. § 1.1104(5)(c) (2003); DE 36-3 at 31:25-32:7 (H. Hashemzadeh Dep.). Upon filing, Pennington had fourteen calendar days to pay the fee. *See* DE 45-1; 47 U.S.C. § 158; Hashemzadeh Dep. at 11:7-19.[3] Once paid, the application status changes from "READY" to "FILED," prompting FCC review. *See id.* at 11:7-19, 13:3-9, 34:92-35:23. However, for a reason the parties dispute, Pennington's application remained marked

---

[1] Per FCC regulation, "[u]nless any licensee advises the Commission to the contrary, the address contained in the licensee's most recent application will be used by the Commission." 47 C.F.R. § 1.5(b). Thus, with no address update from Pennington, the FCC mailed the notification "to the same P.O. Box as it had mailed the prior licenses[.]" DE 36-1 at 5. Pennington initially alleged that he never received the notification because his address changed. *See* DE 36-4 at 20:3-5 (V. Pennington Dep.). Pennington later contradicts this and acknowledges receipt of the 2004 letter. *See id.* at 50:10-20.

[2] At this time, Pennington applied to renew a total of three licenses. *See* DE 36-1 at 386. In addition to the Station at issue in this matter, Pennington sought to renew licenses for a TV station in Burlington, Ohio and for a TV station in Mount Sterling, Kentucky. *See* DE 36-5 at 51:5-14 (M. Williamson Dep.).

[3] The United States's screen shot exhibit, pulled from an FCC video produced by Williamson, confirms notice of the fee-payment requirement and the deadline. *See* DE 45-1 (FCC Video Screenshot) ("Payment must be received by US Bank within 14 (calendar) days of the date that the application is officially reviewed by the Media Bureau's electronic filing system . . . . This deadline applies to any payment submission method (electronic or via paper check). If payment is not received within that time, the filed application will be considered **not paid** and will therefore not be processed by the MB."). The fourteen-day deadline "provides greater latitude to a licensee than required by 47 U.S.C. 158." DE 45 at 4, n.1.

2

as "READY" for nearly twenty years.[4] *See* DE 36-2 at 386 (CDBS Screenshot). Ultimately, because the application's status never changed to "FILED," the FCC neither reviewed nor approved it. *See* H. Hashemzadeh Dep. at 9:24-11:11.

On August 20, 2004, for a reason the parties also dispute, Pennington (via a third-party) allegedly paid the FCC $1,155. *See* DE 36-2 at 385 (Credit Card Statement).[5] As to the license application itself, with Pennington's lack of response and his application still only reflected as "READY," on October 18, 2004, the FCC updated its database to reflect the Station's license cancellation. *See* DE 36-2 at 319 (CDBS Screenshot). The FCC sent notice of this cancellation to Pennington at the selfsame address. *See* DE 36-2 at 183.

Over a decade later, the FCC discovered that Pennington continued to operate the Station despite never renewing its license. *See* DE 1 ¶ 24. On August 16, 2016, two FCC agents traveled to the Station's antenna structure, measured its field strength, and found that it transmitted at a power level of 3,090,946 μV/m, exceeding the limit for unlicensed transmissions. *Id.* ¶¶ 26-27; DE 36-2 at 45 (FCC Investigation Report); *see also* 47 C.F.R. § 15.1. The agents proceeded to visit the Station and spoke with Defendant Michael Williamson, who identified himself as the Station's studio manager and operations manager. *See* DE 1 ¶ 29; DE 36-2 ¶ 34 (FCC Agent Notes). When agents requested evidence of an FCC license, Williamson was unable to provide any. *See* DE 36-2 at 34. Instead, he alleged that Pennington renewed the license, and the FCC lost the records.[6] *See id.*

---

[4] Typically, when the application filing fee is not paid within ten business days, the application status automatically changes from "READY" to "UNPAID." *See* H. Hashemzadeh Dep. at 11:15-12:6. However, if an applicant speaks with an FCC employee after the ten-day window passes, the FCC employee is authorized to change the application status from "UNPAID" to "READY." *See id.* at 11:23-12:6. In those instances, the application status remains marked as "READY" until the applicant pays the filing fee. *See id.* at 12:1-6.
[5] This sum was charged to Judy Maynard's credit card. *See* DE 36-2 at 385. In his deposition, Defendant Michael Williamson indicated that Maynard is a friend of Pennington and in 2004, Pennington "tried to [pay the renewal fees] . . . Judy with her credit card." DE 36-5 at 56:5-17 (M. Williamson Dep.).
[6] Agents also called Pennington, who reiterated Williamson's statements. *See id.*

Because Williamson could not produce a license, the agents issued a Notice of Unlicensed Operation ("NOUO"), which informed Defendants "that an unlicensed station was illegally operating from the Antenna Structure and . . . that continued unlicensed operations could result in additional enforcement action." DE 1 ¶ 32; DE 1-1 (NOUO). The notice unequivocally directed that the station cease operation. On August 22, 2016, the FCC mailed an additional NOUO. DE 1 ¶ 33. Williamson responded, on behalf of the Station, again claiming that the Station renewed its license, but never received FCC confirmation of the renewal. *See id.* ¶ 34. On September 7, 2016, an FCC agent returned to the Station's antenna structure and confirmed that the Station did not cease operation. *See id.* ¶ 36. At that time, the antenna structure transmitted at a power level of 4,129,453 µV/m, still exceeding the limit for unlicensed transmissions. *See id.*

The FCC then sent Defendants a Notice of Apparent Liability for Forfeiture ("NAL") in the amount of $144,344[7] "for apparently operating an unlicensed low power television station[.]" DE 1-1 at 1 (NAL). Regarding the proposed forfeiture amount, the NAL instructed Defendants to either pay in full or file a written statement seeking reduction or cancellation. *See id.* at 10-11. Pennington and Williamson responded, each requesting that the FCC cancel the proposed forfeiture. *See* DE 1-2 at 3 (Pennington Response to NAL); DE 1-3 at 1-2 (Williamson Response to NAL). As grounds, Pennington asserted that the Station provides an important service to

---

[7] The FCC developed this penalty pursuant to 47 U.S.C. § 503(b)(2)(D), which states, "the amount of any forfeiture penalty determined under this subsection shall not exceed $10,000 for each violation or each day of a continuing violation, except that the amount assessed for any continuing violation shall not exceed a total of $75,000 for any single act or failure to act . . . ." 47 U.S.C. § 503(b)(2)(D). The FCC penalized Pennington and Williamson $10,000 per day, for twenty-two days (the amount of time between the FCC's August 16, 2016 visit and September 7, 2016 visit). *See* DE 1 at ¶ 37. While this would equal a total penalty of $220,000 ($10,000 x 22 = $220,000), 503(b)(2)(D)'s statutory maximum penalty of $75,000 prompted the FCC to lower the forfeiture penalty. *See* 47 U.S.C. § 503(b)(2)(D); DE 36-1 at 24 (Motion for Summary Judgment). Though the penalty of $144,34 exceeds the statute's specified $75,000 maximum, the cap expansion is appropriate because the FCC adjusted the amount based on inflation at the time it issued the NAL. *See* DE 36-1 at 24 (citing 47 C.F.R. § 1.80(b)(7) (2017)) ("[T]he maximum penalty for violations of 47 U.S.C. § 503(b)(2)(D) after the 2017 inflation adjustment is $144,344[.]). There is no argument about that lawful limit.

4

Morehead residents, that he filed a renewal application and paid a $1,155 fee in 2004, that (fancifully, it seems) he never operated a television station in Morehead; and he is unable to tender the forfeiture amount. *See* DE 1-2 at 2-4. Williamson also indicated that he is unable to pay the forfeiture amount. *See* DE 1-3 at 1. His response echoed Pennington's comments, asserting that the Station is small, does not operate for profit, and serves rural communities. *See* DE 1-3 at 1-2. Williamson also attached a petition signed by over 120 people, urging the FCC to waive the proposed forfeiture and allow the Station to continue operating. *See id* at 9-15. Ultimately, the FCC declined to cancel or reduce the NAL.[8] *See* DE 1 ¶¶ 40-41. It issued a forfeiture order of $144,344 against both Pennington and Williamson, jointly and severally, and directed them to pay the penalty within thirty days. *See id.* ¶ 41 Neither Pennington nor Williamson has done so. *See id.*

On July 2, 2017, Pennington filed a Petition for Reconsideration, asking the FCC's Media Bureau to reinstate the cancelled license. *See* DE 36-2 at 284. The Media Bureau dismissed the petition as untimely. *See id.* at 291. Pennington then filed an Application for Review, requesting that the FCC review the Media Bureau's decision. *See id.* at 280-87. The FCC denied the request and upheld the Media Bureau's conclusion. *See id.* at 246-51.

b. **Procedural History**

On July 21, 2021, the United States sued Pennington and Williamson to enforce the forfeiture, alleging that their purported unlicensed operation of the Station violated the Communications Act of 1934, 47 U.S.C. § 301. *See* DE 1 ¶¶ 45-46. The United States also claimed that Pennington and Williamson are jointly and severally liable for the $144,344 forfeiture

---

[8] Specifically, the FCC determined "a reduction of the forfeiture is not warranted because the violations in this case are egregious, intentional, and repeated, given the operation of an unlicensed station for 18 years, the failure to comply with the clear spoken and written directive to cease the Station's unlicensed operation, and the potential for such operations to interfere with communications by authorized broadcasters and public safety entities." DE 1 ¶ 41

penalty. *See id.* at ¶ 46. Pennington and Williamson, both proceeding *pro se*, answered. *See* DE 7 (Pennington Answer and Crossclaim); 8 (Williamson Answer and Crossclaim). Each filed a crossclaim nominally against Hossein Hashemzadeh, the former Division Chief of the Video Division. *See* DE 7 at 2-3; 8 at 2-3. Defendants claimed that Hashemzadeh charged $1,155 for the license renewal, but did not consider their renewal application, resulting in the cancellation of the license at issue. *See* DE 7 at 6; 8 at 6. Defendants have made no effort to effect service or otherwise pursued relief, and the Court considers those claims, if any were intended, abandoned.

The United States then filed a motion for summary judgment. *See* DE 36-1. Williamson responded in opposition, *see* DE 47, and filed a motion for partial summary judgment, *see* DE 37. Pennington did not respond to the United States's motion for summary judgment,[9] but also filed a motion for partial summary judgment of his own. *See* DE 38. The United States opposes both of Defendants' motions. *See* DE 44; 45. The matter is fully briefed and ripe for review.

## II. Standard of Review

### a. Summary Judgment Standard

Per Federal Rule of Civil Procedure 56(a), summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In determining whether a genuine dispute exists, the Court considers all

---

[9] Per Local Rule 7.1(c) of the Joint Local Rules of Civil Procedure, "[u]nless otherwise ordered by the Court, a party opposing a motion must file a response within 21 days of service of the motion. Failure to timely respond to a motion may be grounds for granting the motion." LR 7.1(c); *accord Erickson v. United States Dep't of Agric.*, 5:15-CV-00278-JMH, 2016 WL 3546135, at *2-3 (E.D. Ky. June 23, 2016) (granting motion to dismiss because, among other things, plaintiff failed to respond within twenty-one days of service). A Court may not grant summary judgment solely on the absence of a response, however. *See Carver v. Bunch*, 946 F.2d 451, 455 (6th Cir. 1991) ("[A] district court cannot grant summary judgment in favor of a movant simply because the adverse party has not responded."); *see also* FED. R. CIV. P. 56(e) (listing options when response inadequate). The Court may consider unaddressed facts as "undisputed" but may grant summary judgment only "if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." FED. R. CIV. P. 56(e). Here, the United States filed its motion on June 3, 2022. *See* DE 36. To comply with Rule 7.1(c), Pennington should have responded by June 24, 2022. The default leaves the motion, as it pertains to Pennington, unopposed. That said, the Court gives pro se filings fair and flexible consideration.

facts and draws all inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indust. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Further, the Court may not "weigh evidence [or] determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986). If the moving party satisfies its burden, the burden then shifts to the non-moving party to produce "specific facts" showing a "genuine issue" for trial. *Id.* However, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, on which that party will bear the burden of proof at trial." *Id.* at 2552.

A fact is "material" if the underlying substantive law identifies the fact as critical. *See Anderson*, 106 S. Ct. at 2510. Then, "[o]nly disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* An issue is "genuine" is "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511 (citing *First Nat'l Bank of Az. v. Cities Servs. Co.*, 88 S. Ct. 1575, 1592 (1968)). Such evidence must be suitable for admission into evidence at trial. *See Salt Lick Bancorp v. FDIC*, 187 F. App'x 428, 444-45 (6th Cir. 2006).

When parties file cross-motions, the summary judgment standard remains the same. *See Taft Broad Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). The Court "must evaluate each party's motion on its own merits" and, in doing so, "draw all reasonable against the party

whose motion is under consideration." *Id.* (citation omitted); *accord Lasing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

In the enforcement context, the Court reviews the FCC's issuance of a forfeiture penalty de novo. *See United States v. Peninsula Commc'ns, Inc.*, 335 F.Supp.2d 1013, 1016 (D. Alaska 2014) ("The trial *de novo* standard means that the court's review of an FCC forfeiture order is not limited to the administrative record. It does not mean that summary judgment cannot properly be granted if there are no genuine issues of material facts."). This is grounded on 47 U.S.C. § 504(a), which states "[t]hat any suit for the recovery of a forfeiture imposed pursuant to the provision of this chapter shall be a trial de novo[.]" 47 U.S.C. § 504(a). "In the context of other statutes that mandate a trial de novo of an agency decision, courts have held that the use of the procedural device of summary judgment is appropriate." *Peninsula Commc'ns*, 335. F.Supp.2d at 1016 (citing cases).[10]

### b. The Communications Act of 1934

Per to the Communications Act of 1934, television broadcast stations may not operate without a license granted by the FCC.[11] *See* 47 U.S.C. § 301. "Each license granted for the operation of a broadcasting station shall be for a term of not to exceed 8 years. Upon application

---

[10] The extent, if any, to which a jury right would exist in this forfeiture context is not before the Court. Forfeiture is a sui generis process, which may curtail any jury involvement. *See United States v. Any & All Radio Station Transmission Equip.*, 218 F.3d 543, 548 (6th Cir. 2000) ("[T] the rules of civil procedure regarding summary judgment are modified in the context of a civil forfeiture action to take into account the more limited procedures in such an action."). While *Any & All Radio* concerned a § 510 forfeiture action, in the Sixth Circuit, the standard of review appears to be the same as under § 504. *See United States v. Any & All Station Transmission Equip.*, 29 F.Supp.2d 393, 400-01 (E.D. Mich. 1998) ("Unquestionably, the district court has jurisdiction to hear forfeiture proceedings . . . and the government is entitled, under 47 U.S.C. §§ 510(b) and 504, to pursue forfeiture of claimant's equipment in a district court which has jurisdiction over the property. Section 504's provision of a trial de novo in the district court offers claimant an opportunity to present to this Court any factual or legal defenses to the government's imposition of the forfeiture." (citation omitted)). The Court need not resolve that topic in a case without discernible factual issues for resolution.

[11] There are limited exceptions to this requirement. *See* 47 C.F.R. §§ 15.1 *et seq*. The FCC does not require a license where the field strength of transmission is less than or equal to 150 μV/m at three meters. *Id.* at § 15.209. That exception is inapplicable here. Both times FCC agents measured the field strength of the Station's antenna structure, it exceeded 150 μV/m. *See* DE 1 at ¶¶ 26-27, 36. No one claims an exception.

therefor, a renewal of such license may be granted from time to time for a term of not to exceed 8 years from the date of expiration of the preceding license, if the Commission finds that public interest, convenience, and necessity would be served thereby." *Id.* § 307(c)(1). To renew a license, a licensee must file an application four months prior to the license's expiration date. *See* 47 C.F.R. § 73.3539. Traditionally, and by law, within ten business days of filing the application, the licensee must pay the prescribed filing fee. *See id.* § 1.1104; 47 U.S.C. § 158(a). If an applicant fails to pay the fee, the FCC may dismiss the application as defective. *See* 47 C.F.R. § 1.934(d).

The Act permits the FCC to issue forfeiture penalties against any party that "willfully or repeatedly failed to comply substantially with the terms and conditions of any license[.]" 47 U.S.C. § 503(b)(1)(A). The same power extends against any person that "willfully or repeatedly failed to comply" with provisions of the Act. *Id.* (b)(1)(B). The Act defines "willfully" as "the conscious and deliberate commission or omission or such act, irrespective of any intent to violate any provision . . . or any rule or regulation[.]" *Id.* § 312(f)(1). It defines "repeatedly" as "the commission or omission of such act more than once, or, if such commission or omission is continuous, for more than one day." *Id.* § 312(f)(2). The language of each encompasses a known and enduring violation.

The FCC has found that liability for an unlicensed operation extends to "the general conduct or management of the station as a whole . . . not just the 'actual, mechanical manipulation of radio apparatus' but also operation of the radio station generally." *In re Andre Alleyne Jessie White, Forfeiture Order*, 26 FCC Rcd. 10372, 2011 WL 3099890, at *2 (July 26, 2011) (footnotes omitted) (quoting *Campbell v. United States*, 167 F.2d 451, 453 (5th Cir. 1948)). In other words, a person who exercises "any means of actual working control over the [station]" can be liable under § 301. *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Revision of*

*Rules & Policies for the Direct Broad. Satellite Serv.*, 11 FCC Rcd. 9712, 9747 (1995)). Additionally, a person who uses or operates the apparatus for "communications by radio" without a license is liable under § 301. *In re Craig Wakins Bronx NY*, 23 FCC Rcd. 3924, 2008 WL 656225, at *2 (Mar. 12, 2008). "Communications by radio" includes "the transmission by radio of writing, signs, signals, pictures, and sounds of all kinds, including all instrumentalities, facilities, apparatus, and services . . . incidental to such transmission." *Id.* (internal quotation marks omitted) (quoting 47 U.S.C. § 153(33)). The FCC has construed "incidental" broadly, finding, "liability for [an] unlicensed operation may be assigned to any individual taking part in the unlicensed station, regardless of who else may be responsible for the operation, because Section 301 of the Act provides 'no person shall use or operate' radio transmission equipment." *Id.* (holding defendant liable under § 301 although he denied operating the radio station because there was radio station equipment in defendant's apartment and he "did not state that such equipment was there without his permission").

**III. Analysis**

    **a. § 301 of the Communications Act**

In the instant matter, the parties first contest whether Pennington and Williamson violated § 301 of the Communications Act by operating the Station without a license. *See* DE 36-1 at 10-15; 38 at 2; 47 at 1-2. As discussed above, it is undisputed that a broadcast station may not operate without an FCC license. *See* 47 U.S.C. § 301. Each license is granted for a maximum of eight years. *See id.* § 307(c)(1). Prior to expiration, a station seeking to continue operations must renew its license by timely filing an application and paying a filing fee within ten business days. *See id.* at § 158(a). While a renewal application must be filed *before* the license expires, "[w]here there is pending before the Commission at the time of expiration of license any proper and timely application

10

for renewal of license . . . such license shall continue in effect [until renewal determination][.]" 47 C.F.R. § 1.62(a)(1). Further, if an applicant fails to pay the applicable filing fee in a timely manner, the FCC may dismiss the application as defective. *See id.* § 1.934(d).

Regulatory fees are separate from the license application process. Per 47 U.S.C. § 159, the FCC collects regulatory fees on an annual basis "to recover the costs of carrying out the activities described in section 156(a) of this title[.]" 47 U.S.C. § 159. In 2004, the per annum/per license regulatory fee for low-power television stations was $385. *See Assessment & Collection of Regulatory Fees for Fiscal Year 2004, Report & Order*, 19 FCC Rcd 11662, Attach. D (2004).

Here, the Court finds that summary judgment in the United States's favor is warranted. First, though the application was marked "READY" (*i.e.*, pending) at the time of the alleged violation, these circumstances do not fall within § 1.62(a)(1)'s scope. To extend a license beyond its expiration date under this section, the renewal application must be filed *before* the license expires. *See* 47 C.F.R. § 1.62(a)(1). Here, it is undisputed that the Station's license expired by passage of time on August 1, 1998. *See* DE 36-2 at 278 (1993 License Renewal Authorization). Pennington was aware that FCC licenses have an expiration date. *See* 36-4 at 27:5-11 (V. Pennington Dep.). Moreover, Williamson admitted that the Station's last known renewal occurred in 1993. *See* DE 36-2 at 58. Defendants do not claim that they filed an application on or before August 1, 1998. They can only point to the May 2004 application, filed nearly six years after the license's expiration. Even if Defendants believed they had renewed their application in 2004, the record indicates that by 2007 or 2008, they were aware that the Station was unlicensed. Williamson testified that around that time, an intern's work led to discovery that the Station's license was "deleted[.]" DE 36-5 at 15:14-22 (M. Williamson Dep.). Upon learning this, Williamson testified that he contacted Pennington. *See id.* Nothing in the record indicates that

11

either Defendant contacted the FCC or attempted to obtain a new license or resolve any ambiguity in status. A rational trier of fact could not conclude that there was a pending application at the time of the August 1998 expiration. A rational trier of fact could conclude only that the license had expired in 1998.

Moreover, no reasonable trier of fact could conclude that the $1,155 payment was a filing fee. As an initial point, Pennington's claim that he pre-paid the fifty-dollar renewal fees to license three stations through the year 2022 is mathematically impractical and, per FCC undisputed proof, systemically impossible. Simply put, $1,155 is not a multiple of 50. In contrast, the United States's claim that the $1,155 charge was for *regulatory* fees is mathematically and logically consistent. A $385 regulatory fee for three stations totals to $1,155. In any event, Pennington admits that he did not pay filing fees in 2004. *See* Pennington Dep. at 68:4-7. Further, even if a rational trier of fact could conclude that Pennington ham-handedly tried to pay a filing fee in August 2004, the fees would be untimely. At most, Pennington had to pay the filing fee within fourteen calendar days of applying for a license, *see* DE 45-1, but he unequivocally states that he paid the $1,155 "a couple of months" afterwards. *Id.* at 51:19-25; *see also* 47 U.S.C. § 158. The ineffectual fee payment exemplifies the ineffectual licensure maintenance and attention at the Station.

Moreover, Pennington's claim that he pre-paid the filing fee through 2022 is unsupported and rationally contradicted by the record. Hashemzadeh testified that the FCC does not permit applicants to pre-pay filing fees, partially because the rates are subject to change. *See* Hashemzadeh Dep. at 35:9-15, 45:18-24. The language of § 158 supports this. *See* 47 U.S.C. § 158. It mandates that "[i]n every even-numbered year, the Commission shall review the schedule of application fees under this section, and . . . set a new amount of each fee in the schedule[.]" *Id.*

§ 158(b)(1). Further, the witness denied access to or involvement in the filing fee side of the equation. Pennington claims what he claims, and the Court cannot make a credibility finding, but no rational juror could accept that the money he tendered in August 2004 cured the tardy filing-fee issue. This is buttressed by the mathematical dovetailing and Pennington's testimony on paying the regulatory fee.

Finally, even if Defendants had successfully obtained a license in 2004, this would be inconsequential to whether they violated § 301 in 2016. Even if the FCC granted a license renewal in 2004, that would have covered the 1998-2005 period (the maximum term of eight years). Thus, renewals would have been required in 2005 and in 2013. Neither Pennington nor Williamson claims that either, or anyone else from the Station, applied for a license after 2004. Thus, regardless of whether the FCC granted the 2004 license, the Station was unlicensed in 2016. Though Defendants seem to suggest the FCC's purported error during the renewal process extended the term of the license indefinitely, this claim is wholly unsupported and without legal basis.

Further, Pennington concedes that he has not paid regulatory fees through the years. He admits that, except for the outlier payment in August 2004, he has not tendered regulatory or other fees at any point during the long intervening span. *See* Pennington Dep. at 60:4-25, 61:1-9.

In short, based on the record and applicable law, a reasonable trier of fact could only conclude that the Station operated without a license, in violation of § 301, during the charged period. Thus, the Court turns to Williamson's and Pennington's liability under the statute.

b. **Joint and Several Liability**

Next, the parties dispute whether Pennington and Williamson should be jointly and severally liable for the Station's scofflaw operation, and consequently, the forfeiture amount. *See* DE 36-1 at 21; 37-1 at 3.

> i. *Pennington*

As to Pennington, the United States argues there is no genuine dispute as to whether he is jointly and severally liable because he was the Station's licensee. *See* DE 36-1 at 21. Pennington did not respond to the United States's motion, and he does not address this issue in his motion for partial summary judgment. *See* DE 38.

Per § 503, the FCC may impose a forfeiture penalty against "[a]ny person who is determined . . . to have willfully or repeatedly failed to comply with any of the provisions of this chapter[.]" 47 U.S.C. § 503(b)(1)(B). This includes licensees and applicants "for any broadcast or cable television operator license[.]" *See id.* § 503(b)(2)(A). The FCC has found that liability extends to those who contribute to the "operation of the radio station generally" as well as those "who provide[] services and facilities incidental to the transmission of communications by radio." *White*, 26 FCC Rcd. 10372, 2011 WL 3099890, at *2; *Wakins*, 23 FCC Rcd. 3924, 2008 WL 656225, at *2.

Here, there is no genuine issue as to whether Pennington is liable for the forfeiture amount. Section 503 permits forfeiture penalties for licensees, *see* 47 U.S.C. § 503(b)(2)(A), and Pennington admits to being a licensee of the Station. *See* Pennington Dep. at 15:8-17; 36-2 at 83. Moreover, the record supports that Pennington exercised control over the Station and provided services and facilities incidental to its operation. *See White*, 26 FCC Rcd. 10372, 2011 WL 3099890, at *2. He applied for the initial broadcasting license, obtained a license to construct the broadcast tower, and prepared renewal applications. *See* Pennington Dep. at 15:8-21, 16:4-18, 26:11-17; DE 38 at 2. As the Station's licensee, and given the utter failure to respect the licensure requisites and the notice to desist, a reasonable trier of fact could not conclude this fell short of "willful" and "repeated" conduct under § 503(b)(1). He was aware that the license had an

14

expiration date, and was placed on notice in 2007 or 2008, and again in 2016, that the Station was unlicensed. *See* Pennington Dep. at 27:5-11; Williamson Dep. at 15:14-22; *see also* 47 U.S.C. §§ 312(f)(1),(2). Nevertheless, the Station continued to operate without a license for the forfeiture-targeted period. A genuine issue does not exist here.

> ii. *Williamson*

As to Williamson, the United States avers that there is no genuine issue as to his liability for the forfeiture amount because he "demonstrated management and control over the [S]tation as a whole[.]" DE 36-1 at 22. Williamson claims that as a "volunteer/contractor" for the Station, he is not responsible for the license or any incidental penalties. DE 37-1 at 3 (citing *In re Application of Lighthouse Ministries of Nw. Ohio*, 36 FCC Rcd. 7239, 2021 WL 1399926 (2021)); DE 47 at 3.

As detailed above, § 503 authorizes the FCC to impose a forfeiture penalty against "*[a]ny person* who is determined by the [FCC] . . . to have willfully or repeatedly failed to comply with any of the provisions of this chapter[.]" 47 U.S.C. § 503(b)(1)(B) (emphasis added). The FCC has previously held that "liability for [an] unlicensed operation may be assigned to *any individual* taking part in the unlicensed station, *regardless of who else may be responsible for the operation*[.]" *Wakins*, 23 FCC Rcd. 3924, 3927, 2008 WL 656225, at *2 (emphasis added). Liability extends to those who contribute to the "operation of the radio station generally" as well as those "who provide[] services and facilities incidental to the transmission of communications by radio." *White*, 26 FCC Rcd. 10372, 2011 WL 3099890, at *2; *see also Wakins*, 23 FCC Rcd. 3924, 2008 WL 656225, at *2. Liability is not limited to the "actual, mechanical manipulation of the radio apparatus[.]" *Id.* (internal quotation marks omitted) (quoting *Campbell*, 167 F.2d at 453).

Here, there is no genuine issue as to whether Williamson is liable for forfeiture. The fact that others may be liable under § 301 does not relieve Williamson of culpability or liability.

15

Williamson's claim that *In re Lighthouse Ministries* demonstrates that only a licensee is liable under § 301 is misplaced. That case found a licensee liable for the unlicensed operation of a station. *See In re Application of Lighthouse Ministries of Nw. Ohio*, 36 FCC Rcd. 7239, 2021 WL 1399926, at *1. It mentions no other culpable party and does not suggest that the licensee's liability absolved others of liability. Section 503, as well as *Wakins* and *White*, make clear that any person with adequate involvement—not just a licensee—is subject to forfeiture penalty. While Williamson may not have participated in engineering work, physically operated the transmitter, or personally renewed the Station's license, he nonetheless provided key services incidental to the Station's operation. Williamson identified himself as the Station's Studio Manager and stated that he has been the Station's essentially sole operator since 2010. *See* Williamson Dep. at 33:17-20, 34:7-9. In 2016, he signed a letter in defense of the Station's operation, which identified him as the "Operations Manager W10BM." DE 36-2 at 58. Further, Williamson admits, and Pennington corroborates, that his role at the Station included overseeing broadcasting material, content production, editing videos, and performing on air. *See* Pennington Dep. at 32:10-12, 33:5-12 ("Williamson was a contractor who over saw everything [at the Station]."); DE 25 at 1. In short, regardless of title, Williamson provided services incidental to the Station's operation. He also received both NOUOs, spoke for the Station in response, and has purported in filings to have made operational decisions with respect to the Station's manner of broadcasting. *See* DE 1-3 ("I have made a purposeful effort to keep the operation as simple and non-digital . . . from networks to transmitter to receiving viewers TV sets.").

Moreover, a rational trier of fact could only conclude that this amounts to "willful" and "repeated" conduct under § 503(b)(1). Williamson has worked at the Station since March 1997. *See* DE 36-5 at 12:13-16 (M. Williamson Dep). He was aware that the license last renewed in

1993, and was placed on notice in 2007 or 2008, and again in 2016, that the Station was unlicensed. *See* Pennington Dep. at 27:5-11; Williamson Dep. at 15:14-22; DE 36-2 at 58.; *see also* 47 U.S.C. §§ 312(f)(1),(2). Given that Williamson chose to run the Station essentially alone since 2010, he surely had a duty to police the Station's licensure. He last had heard about license deletion in 2007. He did nothing to assure licensure status up to the 2016 FCC action; then, instead of halting, he doubled down and leaned on the slender reed of the 2004 interaction. Thus, is no genuine issue as to whether Williamson would be liable for a forfeiture penalty as a person operating the Station in violation of the Act.

### c. Forfeiture Penalty

Finally, the United States claims that there is no genuine dispute as to whether the $144,344 forfeiture penalty is appropriate. *See* DE 36-1 at 23. Neither Pennington nor Williamson address the reasonableness of the forfeiture in their summary judgment briefing. *See* DE 37-1; 38; 47. However, their responses to the NAL provide the Court with some insight. *See* DE 1-2; 1-3. There, Pennington argued that the Station operates to provide rural communities with information, rather than for a profit. *See id.* at 3. He also informed the FCC of a claimed inability to pay the forfeiture amount. *See id.* Similarly, Williamson indicated that he is unable to pay the forfeiture and describes the penalty as "excessive" and "a miscarriage of justice" given that the Station is small and has "limited financial and legal resources[.]" DE 1-3 at 1-2.

Section 503 authorizes the FCC to issue a forfeiture penalty against those who violate the Communications Act. *See* 47 U.S.C. § 503(b)(1)(B) ("Any person who is determined by the [FCC] . . . to have willfully or repeatedly failed to comply with any of the provisions of this chapter . . . shall be liable to the United States for a forfeiture penalty."). The statute further provides that the penalty "shall not exceed $10,000 . . . each day for a continuing violation" and that the total penalty

17

"for any continuing violation shall not exceed a total of $75,000[.]" *Id.* § 503(b)(2)(D). In determining the ultimate forfeiture penalty, the FCC must also consider "the nature, circumstances, extent, and gravity of the violation and, with respect to the violator, the degree of culpability, any history of prior offenses, ability to pay, and such other matters as justice may require." 47 U.S.C. § 503(b)(2)(E). Inflation adjustments have, by statute, lifted the cap to the maximum here imposed by the FCC.

Here, the FCC's forfeiture penalty is, on the Court's de novo consideration, well-warranted and properly reflects all statutory considerations. The FCC imposed the maximum penalty permitted by § 503(b)(2)(D), based on the Station's twenty-two days of continuous, unlicensed operation.[12] The record supports the propriety of this sum. The Station, though fined for the twenty-two days in fall 2016, actually operated without a license for roughly **eighteen years**. Pennington and Williamson were involved the entire time. The license lapsed in 1998, with no protective steps. In 2004, the Station responded to FCC notice by a) ineffectually making a renewal application; b) failing to timely pay the filing fee; c) tendering, "months later," other fees unrelated to the filing; and d) plainly ignoring an express notification of cancellation in October 2004. Both then expressly learned, in 2007 or 2008, of license deletion by the FCC. The Station took no steps from 2004 through 2016 to renew or assure licensure—this despite multiple intervening periods that would have required action with or without an effective license in 2004. In 2016, when caught license free, the Station (by express action of both Defendants) contumaciously ignored the NOUOs and blamed the FCC. The men could present no license,

---

[12] As discussed above, 47 U.S.C. § 503(b)(2)(D) states that "the amount of any forfeiture penalty determined under this subsection shall not exceed $10,000 for each violation or each day of a continuing violation, except that the amount assessed for any continuing violation shall not exceed a total of $75,000 for any single act or failure to act . . . ." 47 U.S.C. § 503(b)(2)(D). The FCC penalized Pennington and Williamson $10,000 per day, for twenty-two days. *See* DE 1 at ¶ 37. Because this would exceed the maximum penalty, the FCC decreased the penalty accordingly and adjusted for inflation, resulting in the $144,344 penalty. *See* 47 U.S.C. § 503(b)(2)(D); DE 36-1 at 24.

18

initially tried to rely on the stale 1993 license, and stubbornly refused the Agency's direction to stop. The men knew they had done nothing since 2004 to effect licensure and yet blithely operated as if above the law.

The nature, circumstances, and extent of the violations are egregious. Though a low-power station, obduracy in the face of clear rules and legitimate Agency action is a matter of gravity, institutional and otherwise. Further, each Defendant here is culpable, and each has adopted positions and made statements that are flatly wrong at best and highly misleading at worst. Pennington, for example, claimed he didn't even operate a TV station in Morehead. Williamson, though carrying a card, signing a letter, and orally representing himself as a manager, unconvincingly tried to walk that back in briefing. Twenty-two days sets the forfeiture meter for the willful and continuous violation, but the full context is a course of violative and lawless conduct running back to 1998, when the last license expired. The games and fictions of 2004 aside, Defendants well know the Station had not held a valid license for any period since 1998 and had taken no licensure steps at all since the feckless acts of 2004.

When confronted, the Station operators gave no quarter, blaming the FCC, building an ersatz record, and doubling down on operation (all while claiming penury). They twice ignored orders to stop and have put themselves squarely in the regulatory crosshairs. This is of the Defendants' making.

While § 503(b)(2)(E) requires the FCC to consider factors beyond the § 301 violation, the United States indicates that the "FCC complied with this mandate." DE 36-1 at 24. Though the Station, as well as Defendants, allegedly have minimal financial and legal resources, *see* DE 1-2 at 3; 1-3 at 1-2, ability to pay is only one consideration. This alone does not justify a reduction in penalty when considering the length of the violation and Defendants' deliberate conduct. Further,

19

the financial proof is conclusory and incomplete and essentially goes unargued before this Court. To be clear, though, the Court would not view a financial-circumstances reduction as justified in a case that, at bottom, involves eighteen years of impropriety now reflected in a maximum fine over a mere twenty-two days. The forfeiture imposed fits the conduct, and the Court will enforce. The award properly is joint and several—each Defendant was fully, thoroughly, and directly involved in the willful and repeated violations.

### IV.     Conclusion

For the above reasons, the Court **ORDERS** as follows:

1. The Court **GRANTS** DE 36, the United States's motion for summary judgment;
2. The Court **DENIES** DE 37, Williamson's motion for partial summary judgment; and
3. The Court **DENIES** DE 38, Pennington's motion for partial summary judgment.

The Court will enter a separate judgment.

This the 16th day of March, 2023.

Signed By:
*Robert E. Wier*  /s/ REW
United States District Judge